[No. 19443. In Bank.—October 9, 1897.]

## SAN DIEGO WATER COMPANY, Respondent, v. CITY OF SAN DIEGO et al., Appellants.

WATER RATES—VALIDITY OF MUNICIPAL ORDINANCE—COMPENSATION TO WATER COMPANY—CONSTITUTIONAL LIMITATION.—An ordinance fixing water rates to be collected by a water company supplying water to the inhabitants of a city must allow a just and reasonable compensation to the water company for the property used and the services furnished by it; and if the ordinance allows no compensation or reward therefor, it is invalid, as violating the constitutional limitation that property cannot be taken for public use without just compensation.

ID.—ACTION OF MUNICIPAL BODY NOT A JUDICIAL PROCEEDING.—Whether the fixing of water rates by the governing body of a municipal corporation be called a legislative, a judicial, or an administrative act, it is not an adversary judicial proceeding, such as will conclude or divest private rights, but it is a proceeding on the part of such governing body, to which neither the water company nor the rate-payers are parties, and conducted without notice to them; and though it is, within proper limits, a legitimate exercise of governmental powers, yet when carried so far as to deprive any per-

son or corporation of property without just compensation, it is an unlawful exercise of such power, and is void.

Id.—Jurisdiction of Courts—Extent of Review of Municipal Action—Mixed Question of Law and Fact—Evidence.—The courts have jurisdiction to review the action of the governing body of a municipal corporation in fixing rates for the supply of water to its inhabitants, not as appellate tribunals for the purpose of revising the correctness of its determination, but to the extent of ascertaining whether the rates fixed will allow a reward for the property used and the services furnished by the water company, or whether the power exercised has been carried beyond the constitutional limitation by taking its property for public use without just compensation; and that is a mixed question of law and fact, to be decided by the court upon the evidence produced before it, without reference to the evidence upon which the governing body acted.

Id.—Regulation of Public Business—Power to Fix Rates Without Notice—Due Process of Law.—The business of supplying cities and towns with water is so far public in its nature that the state may impose such conditions and restrictions upon its exercise as may be thought proper, and a water company entering upon that business, under the present constitution, is bound to submit to the conditions and restrictions thereby imposed upon it; and the provision of section 1 of article XIV of the state constitution is not opposed to the constitution of the United States, in that it deprives the water company of its property without due process of law, because not providing that notice shall be given of the fixing of water rates to those whose rights are affected, and for an opportunity for them to appear and defend.

Id.—Construction of State Constitution—Time of Acquisition of Rights Immaterial—Reasonable Rates—Just Compensation—Redress for Arbitrary Action.—It was not the intention of the framers of the state constitution to distinguish between rights then existing and those to be thereafter acquired in the business of supplying cities and towns with water, nor was it their intention to confiscate private property, but the meaning of the section in regard to the fixing of rates for such business is, that the governing body of the municipality, upon a fair investigation, and with the exercise of judgment and discretion, shall fix reasonable rates and allow just compensation; and if they attempt to act arbitrarily without investigation, or without the exercise of judgment and discretion, or fix rates so palpably unreasonable and unjust as to amount to arbitrary action, they violate their duty and go beyond the powers conferred upon them, and the court is competent to afford redress therefor.

Id.—Basis for Fixing Water Rates—Valuation of Plant—Cost of Construction.—In the fixing of water rates, the valuation of the plant is the basic element upon which the investigation rests; and the original cost of construction is simply an element to be considered in fixing the present valuation; and the municipality must fix a fair and just rate for the water based upon the actual value of the plant. [Per Garoutte, J., Temple, J., Harrison, J., and Beatty, C. J.]

Id.—Eminent Domain—Compensation for Property Appropriated to Public Use—Reward for Money Properly Expended.—The state has in effect

appropriated the water and plant of the water company to public use, and is bound to provide a just compensation for that use, to be ascertained, not upon the basis of the market value of the property, nor upon what it would cost to replace it, but upon the basis of the revenue that the money reasonably and properly expended in the construction of the works actually in use is capable of producing. [Per Van Fleet, J., Henshaw, J., and McFarland, J.]

Id.—Limit of Just Compensation — Judicial Question — Lowest Current Rate of Interest.—The question of just compensation is a judicial question, to be determined in the ordinary course of judicial proceedings; and the water company is entitled to a net compensation at least equal to the lowest current rate of interest on the basic value of its plant, properly ascertained. [Per Van Fleet, J., Henshaw, J., McFarland, J., and Beatty, C. J.]

Id.—Power of Court to Determine Just Compensation.—The court has no power to determine any limit of just compensation, but only to inquire whether some compensation, however small, is allowed; and the question of the extent or limit of such compensation is for the municipal body alone to determine. [Per Garoutte, J., Temple, J., and Harrison, J.]

Id.—Bonded Debt of Water Company.—Whether the basis for just compensation to the water company be considered to be the reasonable cost or the actual value of the plant, its bonded indebtedness is to be disregarded in ascertaining such compensation.

Id.—Depreciation of Plant by Use — Repairs—Sinking Fund.—In determining the question whether the water company is compensated by the rates established by ordinance, ordinary repairs should be charged to current expense, and substantial reconstruction or replacement should be charged to the cost of construction; but no percentage upon the investment can be charged as a sinking fund, to be added to operating expenses, as a general provision against depreciation of the plant by use.

Id.—Cost of Plant—Finding against Evidence.—The evidence reviewed as to the cost of the plant of the plaintiff water company, and a finding as to such cost, held unsupported by the evidence. [Per Van Fleet, J., Henshaw, J., McFarland, J., and Harrison, J.]

Id.—Duty of Council in Fixing Rates—Public Investigation—Notice—Rights of Water Company—Unfair Refusal of Request.—An investigation by a city council for the purpose of fixing water rates ought to be held publicly, and upon such reasonable notice of the times and places of meetings as will enable those interested to be present: and it is the duty of the council, when requested by the water company, to give it a reasonable opportunity to be heard, not for the purpose merely of presenting its own evidence, but also of explaining or overcoming, if it can, evidence presented by others; and where the right of the water company, upon its request to be present throughout such an investigation and to rebut or overcome evidence adduced against it, was denied by the council and by its committee of investigation, the unfairness in the investigation overcomes the presumption of the correctness of its decision. [Per Van Fleet, J., Henshaw, J., and McFarland, J.]

APPEAL from a judgment of the Superior Court of San Diego County.   J. W. McKinley, Judge.

The facts are stated in the opinions of Justices Van Fleet and Garoutte.

William H. Fuller, and Clarence L. Barber, for Appellants.

There can be no relief against water rates fixed by a municipal board except in cases of actual fraud or gross injustice. (*Spring Valley Water Works v. San Francisco*, 82 Cal. 286; 16 Am. St. Rep. 116.)   It is not necessary for the board as a body to hear witnesses and examine evidence.   (*Bissell v. Jeffersonville*, 24 How. 287, 297; *Collins v. Holyoke*, 146 Mass. 298, 307; *Birdsall v. Clark*, 73 N. Y. 73; 29 Am. Rep. 105; *San Francisco Gaslight Co. v. Dunn*, 62 Cal. 580.)   The findings as to cost and operating expenses are against the evidence.   The court erred in allowing any percentage for deterioration of the plant. The fixing of rates is a legislative act.   (*Sheward v. Citizens' Water Co.*, 90 Cal. 640; *Budd v. New York*, 143 U. S. 517, 545, 546.)

H. E. Doolittle, and T. L. Lewis, also for Appellants

The act of fixing rates is legislative and not judicial. (Const., art. XIV, sec. 1; *Wulzen v. Board of Supervisors*, 101 Cal. 24; 40 Am. St. Rep. 17; *Quinchard v. Board of Trustees*, 113 Cal. 664, 669, 670; *Munn v. Illinois*, 94 U. S. 113; *Chicago etc. Ry. Co. v. Minnesota*, 134 U. S. 461.)   A legislative act will not be interfered with by the courts.   (*Paulsen v. Portland*, 149 U. S. 38; *Spring Valley Water Works v. San Francisco*, 82 Cal. 305–07, 314; 16 Am. St. Rep. 116; *Porter v. Haight*, 45 Cal. 639; *Jacobs v. Board of Supervisors*, 100 Cal. 121; *Nisbitt v. Greenwich Board of Works*, L. R. 10 Q. B. 465; *Des Moines Gas Co. v. Des Moines*, 44 Iowa, 505; 24 Am. Rep. 756; *Alpers v. San Francisco*, 32 Fed. Rep. 503; *Wright v. Defrees*, 8 Ind. 298.)   The cost of the system cannot be used as a basis for fixing rates, but only its present value.   (*Spring Valley Water Works v. San Francisco*, 82 Cal. 286; 16 Am. St. Rep. 116; *San Diego etc. Co v. National City*, 74 Fed. Rep. 79; *Reagan v. Farmers' Loan etc. Co.*, 154 U. S. 412; *Dow v. Beidelman*, 125 U. S.

680; *Ames v. Union Pac. Ry. Co.*, 64 Fed. Rep. 165.)    Interest on bonds and maintenance of the plant should be excluded from computation.    (*Spring Valley Water Works v. San Francisco*, opinion of Justice Thornton, 82 Cal. 330; *San Diego etc. Co. v. National City, supra.*)

Works & Works, for Respondent.

The law of this state concerning water rates violates the constitution of the United States respecting due process of law, in not providing for notice and an opportunity to be heard. (*Chauvin v. Valiton*, 8 Mont. 451; *Stuart v. Palmer*, 74 N. Y. 183, 191; 30 Am. Rep. 289; *Kuntz v. Sumption*, 117 Ind. 1; *Hutson v. Protection Dist.*, 79 Cal. 90; *Railroad Tax Cases*, 13 Fed. Rep. 722, 750; *Ulman v. Mayor*, 72 Md. 587; *Windsor v. McVeigh*, 93 U. S. 274; *Bank of State v. Cooper*, 2 Yerg. 599; 24 Am. Dec. 517, 538, note; *Mercantile Trust Co. v. Texas etc. Ry. Co.*, 51 Fed. Rep. 529; *McMillan v. Anderson*, 95 U. S. 37; *Davidson v. New Orleans*, 96 U. S. 97; *Murray v. Improvement Co.*, 18 How. 272, 276; *People v. O'Brien*, 111 N. Y. 62; 7 Am. St. Rep. 684; *Chicago etc. Ry. Co. v. Minnesota*, 134 U. S. 418; *Richmond etc. Ry. Co. v. Trammel*, 53 Fed. Rep. 196.)    The courts have jurisdiction to review and set aside oppressive and unjust action in fixing rates.    (*Spring Valley Water Works v. San Francisco*, 82 Cal. 286; 16 Am. St. Rep. 116; *Chicago etc. Ry. Co. v. Minnesota, supra; Budd v. New York*, 143 U. S. 517; *Pensacola etc. Ry. Co. v. State*, 25 Fla. 310; *San Diego Land etc. Co. v. National City*, 74 Fed. Rep. 83.)    Rates should pay operating expenses, interest on bonds, and something in addition. (*Chicago etc. Ry. Co. v. Dey*, 35 Fed. Rep. 866, 879, 880; *Pensacola etc. Ry. Co. v. State, supra; Ames v. Union Pac. Ry. Co.*, 64 Fed. Rep. 165, 176; *Chicago etc. Ry. Co. v. Dey*, 38 Fed. Rep. 656; *United States v. Workingmen's etc. Council*, 54 Fed. Rep. 994, 995; *Reagan v. Farmers' Loan etc. Co.*, 154 U. S. 362, 390; *Clapp v. Spokane*, 53 Fed. Rep. 515.)    The company is entitled to a remuneration upon the capital actually and *bona fide* invested in the plant, corresponding to the ruling rates of interest.    (*New Memphis Gas etc. Co. v. Memphis*, 72 Fed. Rep. 952, 955.)    A sinking fund should be allowed for depreciation of the plant, as well as for interest on bonds.    (*Capital City Gaslight Co. v. Des Moines*, 72 Fed. Rep. 848.)

Trippet & Neale, for Respondent.

Just compensation is required when private property is taken for public use. (Const. art. I, sec. 14.) Money invested by a quasi public corporation is in the nature of a loan to the public for its benefit, for which it is entitled to legal interest as just compensation. (Civ. Code, sec. 1914, et seq.) The courts are bound to relieve against unjust and oppressive rates. (*Chicago etc. Ry. Co. v. Minnesota*, 134 U. S. 418; *Minneapolis etc. R. R. Co. v. Minnesota*, 134 U. S. 467.) Interest should be based on the original necessary cost of the plant, that being the investment for the public benefit.

John Garber, *Amicus Curiæ*, for Respondent.

It is when private property is devoted to public use, or affected with a public interest, that it becomes the subject of regulation. (Tiedeman's Limitations of Police Power, sec. 92; *Budd v. People*, 143 U. S. 548.) A corporation whose property is devoted to public use is entitled to just compensation, of which it cannot be deprived. (*Pensacola etc. Ry. Co. v. State*, 25 Fla. 310; *Chicago etc. Ry. Co. v. Minnesota*, 134 U. S. 418–58; *Reagan v. Farmer's Loan etc. Co.*, 154 U. S. 399; *Ames v. Union Pac. Ry. Co.*, 64 Fed. Rep. 165; *San Diego etc. Co. v. National City*, 74 Fed. Rep. 81.) Property may be taken for public use in the constitutional sense, though title and possession may remain undisturbed. (Lewis on Eminent Domain, sec. 56.) The control of property for the public benefit by regulation of rates is a taking for public use, which requires just compensation from the rates fixed. (See cases cited, *supra; Munn v. Illinois*, 94 U. S. 125; *Chicago etc. Ry. Co. v. Dey*, 35 Fed. Rep. 866; 38 Fed. Rep. 656.) The constitutional guarantee for just compensation must have a liberal construction. (*Boyd v. United States*, 116 U. S. 635; Lewis on Eminent Domain, sec. 462.) Profits or earning capacity is a potent factor and controlling as to value of property taken for public use. (*Montgomery Co. v. Schuylkill Bridge Co.*, 110 Pa. St. 59; *Ripley v. Great Northern*, L. R. 10 Ch. App. 435; *Young v. Harrison*, 17 Ga. 30; *Boom Co. v. Patterson*, 98 U. S. 403; *Bridgeman v. Hardwick*, 67 Vt. 653.) The state, by regulation of rates, in effect takes the public use of the property during the period of regulation or from year to year,

and is bound to make the regulated earnings yield a just compensation for the use so taken by a fair interest on the money invested. (*San Diego etc. Co. v. National City, supra; Ames v. Union Pac. Ry. Co., supra; Capital City Gaslight Co. v. Des Moines,* 72 Fed. Rep. 848, 954, 955.) The state has no right to impair the original value of the investment, and should allow legal interest on the capital expended. (Hare's American Constitutional Law, 771.)

S. F. Leib, *Amicus Curiæ,* for Respondent.

The constitution requires reasonable rates to be fixed; and the discretion vested in the city authorities has its limits and boundaries within what may be determined on proof to be the limits and boundaries of reasonable rates, just compensation, and due process of law. (Const., art. XIV, sec. 1; art. I, secs. 13, 14.)

VAN FLEET, J.—The plaintiff is a corporation engaged in the business of supplying water to the city of San Diego and its inhabitants. In February, 1890, the common council of the city passed an ordinance fixing the water rates for the year beginning July 1, 1890. In May, 1890, the plaintiff brought this action against the city, the common council, the mayor, and the individual members of the council, to annul this ordinance and enjoin its enforcement. The complaint alleged in substance that the entire revenue which plaintiff could receive during the year in question, under the rates so fixed, would be insufficient to pay its operating expenses and fixed charges for that year, and would, therefore, afford no reward whatever to plaintiff for furnishing the water, and that the ordinance would deprive plaintiff of its property without process of law and without compensation. It was also alleged that, by reason of certain fraudulent practices on the part of the council, the plaintiff was deprived of a fair opportunity to be heard before the council, and prevented from properly presenting its side of the case. The action was tried after the expiration of the year in question, and a judgment was entered declaring the ordinance to be void, and setting the same aside. From this judgment, and from an order denying their motion for a new trial, the defendants appeal.

The findings of the court were in substance: That the prop-

erty and plant of the plaintiff necessary to supply water to the city and its inhabitants actually cost $750,000; that the reasonable and necessary operating expenses of plaintiff for the year in question, and actually expended by it for that ˙purpose, amounted to $40,000; that plaintiff was indebted upon its bonds for money borrowed, amounting to the sum of $1,000,000, bearing interest at the rate of five per cent per annum, of which amount $750,000 had been necessarily and properly expended for the construction of the plant; that the total receipts of plaintiff for the year in question derived from the rates fixed by said ordinance could not be and were not greater than $65,788.65; that the annual depreciation of the plant on account of natural decay and use amounted to three and one-third per cent of its value; that no dividends for the stockholders of plaintiff had been or could be earned from the rates fixed by said ordinance for said year; and that the rates so fixed were not just or reasonable.

The court also found certain facts concerning the proceedings of the common council and its committee in investigating the subject matter, which will be noticed hereafter.

These findings are assailed as being in some particulars unsupported by the evidence; and many questions of law have been ably argued by numerous counsel. Some of these questions, though highly interesting and important, are not necessarily involved in this appeal, and we shall therefore not notice them; but we will, so far as space will permit, consider each of the other points made.

1. It is contended by defendants that, under article XIV of the constitution of this state, a court has no power, in the absence of fraud, to hold such an ordinance invalid merely because the court finds the rates fixed thereby to be unjust and unreasonable.

We shall not attempt in this opinion to review the many cases on this subject. It is sufficient to say that the supreme court of the United States (whose decisions on this matter are controlling) has repeatedly decided that the power of the state to fix and regulate the rates of compensation to be charged by persons and corporations in charge of certain public utilities is so limited by the constitution of the United States that it cannot be exercised to such an extent as to require any such person or

corporation to furnish its property or services without reward; and that, if the rates are fixed by legislative power, or otherwise than by appropriate judicial proceedings in which full notice and opportunity to appear and defend are given, it is within the province of the courts to review such action, to the extent, at least, of ascertaining whether the rates so fixed will furnish some reward for the property used and services furnished. To fix rates that will allow no such reward is to take property for public use without just compensation. To this extent at least, then, the court was entitled to go in this case.

But appellants contend that in any event the court could do no more in reviewing the action of the common council than to say whether there was or was not evidence produced before that body sufficient to sustain its conclusions; and that the court was not at liberty to determine the question upon other and perhaps new evidence not produced before the council, nor to substitute its judgment as to the reasonableness of the rates for the judgment of that body. In this contention we think that counsel entirely misconceives the nature of the functions respectively exercised under our constitution by the rate-fixing body and by the courts. Whether the fixing of rates by the council be called a legislative, a judicial, or an administrative act, it is certainly not an adversary judicial proceeding such as, under the constitution, will conclude private rights. It is a proceeding on the part of the government to which neither the water company nor the rate payers are parties, conducted without notice to them, and without any right on their part to effectually intervene. Such a proceeding cannot operate to divest private rights; and, though the supreme court of the United States holds it to be a legitimate exercise of governmental powers, that court also holds that when it is carried so far as to deprive anyone of his property without just compensation it is an unlawful exercise of such power, and simply void. The function of the courts is merely to ascertain whether the power has been carried beyond the constitutional limits so fixed; and, if such be found to be the case, to declare the acts of the council void. They do not sit as appellate tribunals to review the correctness of the council's determination, nor need they know anything about the evidence on which that body has acted. All that they have to consider is, whether, in a given case, the result of the council's ac-

tion will be to take the property of the complaining party without just compensation. That is a mixed question of fact and law, to be decided by the court upon the evidence produced before it.

2. On the other hand, the plaintiff contends that section 1 of article XIV of the constitution of this state is opposed to the constitution of the United States, in that it operates to deprive the water company of its property without due process of law. It is argued that no provision for the fixing of water rates by the tribunal thereby created can be valid without notice to those whose rights are to be affected, and an opportunity to them to appear and defend, the right to which must be given by the constitution itself. That no such notice or hearing is provided for must be admitted; but the consequence contended for does not follow.

In the first place there is nothing in the pleadings or evidence in this case to show that any water rights or property of plaintiff used in furnishing the water in question were acquired before the adoption of the present constitution. On the contrary, we think it substantially appears that they were all acquired since that time. We are unable to perceive why the people of this state in adopting that constitution had not the right to declare that all water not then reduced to private ownership should thereafter remain public, and that thereafter every person undertaking the business of supplying cities or towns or their inhabitants with water should do so upon the condition that the rates to be charged therefor should be conclusively fixed by the state. Such a business is so far public in its very nature that the state might lawfully forbid its exercise by any private individual, and, *a fortiori*, might impose such conditions and restrictions upon its exercise as might be thought proper. If, then, that section of the constitution could be construed as rendering the decision of the council absolutely final and conclusive, plaintiff, at least, could not be heard to complain. If it chose, with that section in force, to enter upon that business, it was bound to submit to the conditions thereby imposed.

But we think that the true construction of that section is such that it is not open to the constitutional objection urged, even if raised by one who at the time of its adoption was engaged in that business. It obviously was not the intention of

the framers of that provision to make any distinction between rights then existing and those to be thereafter acquired, nor can we attribute to them any intention of confiscating private property. The meaning of the section is, that the governing body of the municipality, upon a fair investigation, and with the exercise of judgment and discretion, shall fix reasonable rates and allow just compensation. If they attempt to act arbitrarily, without investigation, or without the exercise of judgment and discretion, or if they fix rates so palpably unreasonable and unjust as to amount to arbitrary action, they violate their duty and go beyond the powers conferred upon them. Such was the conclusion reached by this court in *Spring Valley Water Works v. San Francisco*, 82 Cal. 286, 16 Am. St. Rep. 116, to which conclusion we adhere. Although that case was decided without the light cast on the subject by later decisions of the supreme court of the United States, and contains some observations which perhaps may require modification, we are satisfied with the correctness of the conclusion there given to this section of the constitution.

According to this construction, the rules announced under the first head in this opinion are applicable. If the council has fixed rates so palpably unreasonable and unjust as to amount to a taking of plaintiff's property without just compensation, it has so far exceeded the powers conferred upon it, and the court is competent to afford redress.

3. This brings us, then, to the question whether the findings support the judgment. They show that the total receipts of the plaintiff from the rates fixed by the council would be and were insufficient to pay plaintiff's actual and necessary operating expenses, together with the interest on so much of its bonded indebtedness as was necessarily and properly expended by it in the construction of its plant, necessarily and actually used for the supplying of the water here in question—indeed, would fall short more than $11,000 of paying those charges. No circumstances requiring such a loss were found, and the finding that these actual charges were necessarily and properly incurred in the legitimate exercise of the business of furnishing water to the city negative the existence of any such circumstances. It is clear that under the rule laid down by the supreme court of the United States in *Reagan v. Farmers' Loan*

*etc. Co.*, 154 U. S. 362, 412, that court would hold those rates to be so unreasonable and unjust as to require the court to set them aside. The decision in that case, however, is not in all respects satisfactory; and, after a careful examination of all the many cases on this subject, we are unable to discover that any consistent or adequate rules controlling the exercise of the governmental power of fixing rates have yet been judicially laid down. The subject is one of extreme complexity, and its inherent difficulties have been increased rather than diminished by the numerous decisions in which it has been discussed. We think, however, that a consideration of the real nature of the power conferred by our constitution will afford a sufficient solution of the question.

It is apparent that the water company does not own the water which it collects and supplies, or the plant which it uses to collect and distribute that water, in the same sense in which a man is said to own his house or his farm. By the very nature of the use to which it is applied, the company has devoted that property to a public use. Having once undertaken to perform that public duty, it must continue to perform it, and must carry on its business under the lawful regulations of the government. In effect the state may be said to have appropriated the water and the plant to public use. For that appropriation it is bound to make just compensation, and it has provided for such compensation by requiring the municipal authorities to fix just and reasonable rates at which the water is to be furnished to and received by the consumers. Since the state has "taken" the use of this property, it is bound to provide a just compensation for that use, and article XIV of the constitution must be construed as providing for that just compensation.

The question of what is just compensation in such a case is, we think, in all respects analogous to the question which arises in every case of appropriation under the power of eminent domain; and it may be reduced to the formula that the public must pay the actual value of that which it appropriates to the public use. In determining such value three, and we believe only three, methods are possible: 1. Either by ascertaining what the property could be sold for (its market value); or 2. By ascertaining what it would cost to replace it; or 3. By ascertaining the revenue it is capable of producing. In cases like the present,

however, neither the first nor the second method can be resorted to. The judicial test of market value depends upon the fact that the property in question is marketable at a given price, which in turn depends upon the fact that sales of similar property have been and are being made at ascertainable prices. But such property as this is not so sold, at least, not often enough to furnish a fair criterion; and the very fact of governmental regulation would necessarily control the price. Until the rates are fixed no one can say how much the property would sell for, and therefore that price cannot be ascertained as a basis for fixing those rates.

The second method is entirely inapplicable to property of this kind. The construction of municipal waterworks is a matter of growth. It is necessary in common prudence, on the one hand, to construct the works of such capacity as to satisfy the needs of the growing city, not only at the moment, but within the near future; and, on the other hand, not to extend them so much as to cast an unnecessary burden on the stockholders, or the present consumers. As such works are a necessity to the city, they must keep pace with, and to some extent anticipate, its growth. When constructed they stimulate to that extent the progress of the city, and tend, like all conveniences, to lower the general cost of production of all things. It results that at least the first water system in any city occupies the position of a pioneer. At any expense the works must be constructed, and usually no reward can be realized by the constructors until some time has elapsed. In the mean time, as the city grows, in part by reason of this very supply of water, the facility of constructing works of all kinds is increased, and the cost of such construction diminished. It would, therefore, be highly unjust to permit the consumers to avail themselves of the plea that at the present time similar works could be constructed at a less cost, as a pretext for reducing the rates to be paid for the water. The reduced expense, if it be reduced, is due in part at least to the very fact that the city has been provided at the cost of the water company with increased facilities for doing business.

But it is said that those who enter upon any business enterprise undertake the risk of being undersold by those who, coming later into the field, have the advantage of a cheapening of construction. But this is not an ordinary business enterprise.

Those who engage in it put their property entirely into the hands of the public. Having once embarked it is beyond their power to draw back. They must always be ready to supply the public demand, and must take the risk of any falling off in that demand. They cannot convert their property to any other use, however unprofitable the public use may become. They have expended their money for the benefit of others, and subjected it to the control of others. That money has, in effect, been taken by the public; and the public, while refusing to return that money, cannot be heard to say that it no longer has need for all of it.

Nor would it, on the other hand, be just to the consumers to require them to pay an enhanced price for the water, on the ground that it would now cost more to construct similar works. Such a contingency may well happen; but to allow an increase of rates for such reason would be to allow the water company to make a profit, not as a reward for its expenditures and services, but for the fortuitous occurrence of a rise in the price of materials or labor. The law does not intend that this business shall be a speculation in which the water company or the consumers shall respectively win or lose upon the casting of a die, or upon the equally unpredictable fluctuations of the markets. For the money which the company has expended for the public benefit it is to receive a reasonable, and no more than a reasonable, reward. It is to be paid according to what it has done, and not according to what others might conceivably do. In effect, the bargain between the company and the public was made when the works were constructed: and this matter is to be determined according to the state of things at that time.

We must then have recourse to the third standard of value— the revenue which the property is capable of producing. At the first blush there might seem to be a difficulty in applying this standard, for the revenue received by the company will be absolutely controlled by the rates fixed, and no revenue can be collected except upon rates so fixed. This difficulty has led one of the counsel in this case, in a singularly able and ingenious argument, to contend that the rates must be so fixed as to enable the company to obtain precisely the revenue which it would realize if the rates were not regulated by the public at all. To this proposition we cannot assent. The whole history of mu-

nicipal regulation conclusively shows that its principal purpose
was always to diminish what were rightly or wrongly believed
to be exorbitant charges.   The theory of its application has al-
ways been that it is necessary to restrain the proprietors of
what have been called "virtual monopolies" from imposing ex-
travagant and unreasonable tariffs for the use of their facilities.
Whether the system be well conceived or not, whether it accords
with the theory of free government, are not questions with
which we have to do.   It is sufficient that the law recognizes
that there is a standard by which just compensation may be
measured, and that it is intended to prevent that measure from
being exceeded.

What that standard is, as applied to the present case, we think
not difficult of ascertainment.   As we have said, it is not the
water or the distributing works which the company may be said
to own, and the value of which is to be ascertained.   They
were acquired and contributed for the use of the public; the
public may be said to be the real owner, and the company only
the agent of the public to administer their use.   What the
company has parted with, what the public has acquired, is the
money reasonably and properly expended by the company in
acquiring its property and constructing its works.   The state
has taken the use of that money, and it is for that use that it
must provide just compensation.   What revenue money is cap-
able of producing is a question of fact, and, theoretically at
least, susceptible of more or less exact ascertainment.   Regard
must be had to the nature of the investment, the risk attend-
ant upon it, and the public demand for the product of the en-
terprise.   It would not, of course, be reasonable to allow the
company a profit equal to the greatest rate of interest realized
upon any kind of investment, nor, on the other hand, to compel
it to accept the lowest rate of remuneration which capital ever
obtains.   Comparison must be made between this business and
other kinds of business involving a similar degree of risk, and
all the surrounding circumstances must be considered.   An im-
portant circumstance will always be the rate of interest at which
money can be borrowed for investment in such a business; and,
where the business appears to be honestly and prudently con-
ducted, the rate which the company would be compelled to pay
for borrowed money will furnish a safe, though not always con-

clusive criterion of the rate of profit which will be deemed reasonable. In ordinary cases, where the management is fair and economical, it would be unreasonable to fix the rates so low as to prevent the company from paying interest on borrowed money at the lowest market rate obtainable; and, even then, some allowance or margin should be made for any risk to which the company may be exposed, over and above the risk taken by a lender.

This being so, the existence of the bonded indebtedness on which so much stress has been laid, and which has seemed to present so difficult a problem in some of the cases, must be disregarded. That fact, indeed, it seems to us, can never be important, except as entitling the holders of the bonds, as parties in interest, to be heard in actions like the present. Evidently, no distinction can be made between those who construct the works with their own money and those who do so with money borrowed from others. In either case the money actually invested is the basic criterion of the revenue to be allowed.

It follows that we cannot say that the finding of the court below, that the rates fixed by the city council were less than what was reasonable, is unsupported by the evidence. After deducting current expense for the year—$40,000—from the revenue received—$65,788.65—there would be left but $25,788.65 —or but little more than three and one-third per cent upon $750,000, the actual cost of the works; while the evidence shows that the company was compelled to pay a much higher rate upon money which it appears to have fairly borrowed. It is true that the evidence is not as full and satisfactory on this question as it should be, doubtless owing to the fact that the rules governing this inquiry were not clearly apprehended by the counsel who tried the case. But as no attempt was made to show that the rate of interest paid by the company was above the lowest market rate, and as the prudence and economy of the management were not successfully impeached, we cannot say that the court below was not justified in the conclusion to which it arrived on this question.

But it is contended that the power of the court is at most to inquire whether some reward will be provided by the rates fixed and that if some reward, however small, is so provided, the court cannot interfere. We have been referred to *dicta* in some of the

cases which do support that contention; but we are unable to agree with that conclusion. It is an elementary doctrine of constitutional law that the question of just compensation is a judicial question to be determined in the ordinary course of judicial proceedings; and, construing article XIV of our constitution with section 14 of article I (as we think we are bound to do), we find no difficulty in holding that whenever the rates fixed by the council are grossly and palpably insufficient to furnish such a revenue as will afford just compensation within the rules above declared, redress may be had in the courts. Of course, every slight or conjectural deficiency will not justify an appeal to the courts; nor, if the question be doubtful, will the court, in the absence of fraud or other special ground of equitable interference, substitute its judgment for that of the municipal body. But whenever it is clear and beyond question that the revenue which the company can possibly receive under the rates fixed will be wholly insufficient to allow it the compensation to which it is legally entitled, it is the duty of the court to declare the ordinance void. Such is the case under the findings here, and those findings must, therefore, be held to support the judgment.

It should, of course, be said that it does not follow that in every case the company will be entitled to credit for all of its current expenditures, or to receive a compensation based on the entire cost of its works. Reckless and unnecessary expenditures, not legitimately incurred in the actual collection and distribution of the water furnished, or in the acquisition, construction, or preservation of so much of the plant as is necessary for that purpose, cannot be allowed. Nor can the investment on which the company is entitled to base its compensation be held to include property not now actually employed in collecting or distributing the water now being supplied, however useful it may have been in the past, or may yet be in the future. It is the money reasonably and properly expended in each year in collecting and distributing the water which constitutes the current expenses which may be allowed; and it is the money reasonably and properly expended in the acquisition and construction of the works actually and properly in use for that purpose, which constitutes the investment on which the compensation is to be computed. The amounts stated in the findings in this case are found to be of that character.

4. But it is contended that the findings in several particulars are unsupported by the evidence.

It is claimed that the evidence does not justify the finding that $750,000 had been actually expended in the purchase and construction of the plant. On this subject the evidence is extremely unsatisfactory. Apart from estimates testified to by engineers, the only evidence of the cost was the books of the company, which placed the amount at $735,000. Of this sum defendants object to items amounting to about $127,000, viz., an alleged duplicate of the entry of $13,932, an alleged overcharge of $25,000 in the real estate account, and the sum of $88,000 alleged to be the cost of certain works abandoned and not in use. On these questions we have had little or no assistance from counsel for respondent, and our examination of the evidence has failed to satisfy us on any one of them. The books, or those portions of them brought up in the transcript, require much explanation, which has not been furnished us. In fact, the case appears to have been tried largely on a wrong theory, the greater portion of the evidence consisting of the testimony of expert witnesses as to the value of the property. This is at the best an unsatisfactory way of determining the question of actual cost (for which purpose only could it be admissible), and should not be resorted to when better evidence can be obtained. As against the company, at least, its books furnish better evidence on this subject, and cannot be disregarded. These books certainly show the cost to have been less than $750,000, though we are unable to determine the precise amount properly shown by them; and the evidence clearly discloses that portions of the plant included in that cost are not now in use, if, indeed, they have not been totally abandoned. We think, therefore, that this finding is not justified by the evidence. On this and kindred matters not only is the burden of proof on the plaintiff, but it is bound to establish them by the most clear and satisfactory evidence, in order to overcome the presumption of the correctness of the action of the city council.

The finding that the expenses of the company for the year in question were $40,000 is also attacked. The books of the company put the amount at $44,255.30. Of this amount appellants object to items of about $5,000 as unnecessary and improper, and object particularly to an item of $12,800, being an un-

paid bill which is disputed by plaintiff, and on which its liability is left doubtful. Counsel for respondents have not attempted to answer these points. As the evidence is presented to us in an unsatisfactory shape, we will say no more than that it does not support the finding. Whether all of the items complained of are proper or improper cannot be determined upon this record, but some of them are not shown to be proper. It will be the duty of the court on a retrial to allow no item of expenditure which is not satisfactorily shown to be an actual and proper charge in the actual conduct of the business of supplying water; and, when legal or other general expenses are claimed, they must be shown to have had a proper relation to that business. Of course, the items of expenses in the present action should be disregarded. The trial being had after the expiration of the year for which the rates in question were fixed, the amounts of revenue and expenses are capable of exact proof.

With regard to the question of the depreciation of the plant by use, it is sufficient to say that ordinary repairs should be charged to current expense, that substantial reconstruction or replacement should be charged to the construction account, and that depreciation should not otherwise be considered. It is doubtless difficult in many cases to properly discriminate between current and ordinary repairs and such repairs as amount in effect to new construction. Such difficulties, when they arise, must be solved by the application of the principles on which ordinary business enterprises are conducted.

It may be added that when, as appears to have been the case in this instance, portions of the company's expenses are specifically repaid by the consumers, such expenses should be eliminated from the computation. This will apply at least to the "taps" put in for private consumers.

5. Among other things, the court below made the following finding:

"10. That the taking of evidence as to the value of the plaintiff's plant and the rates that should be fixed by the common council of said city, during the month of February, 1890, for the year commencing July 1, 1890, was by said common council delegated to a joint committee consisting of three members from the board of delegates and three members from the board of aldermen of said common council. That said joint committee

proceeded to and did take evidence from the plaintiff and its officers and other witnesses for a number of days, and that on the twenty-first day of February, 1890, the plaintiff then being before said committee by its attorney, said attorney inquired of said committee whether other evidence would be taken, and announced that if other evidence would be taken he, the said attorney, desired to be present, and especially that if evidence was given by members of the board of public works of said city, or estimates were taken from said members of the value or cost of the plaintiff's plant, that he, said attorney, desired to be present and examine said members of the board of public works as to the evidence given by them or the estimates furnished. That it was announced by one of said committee at that time, in the presence of the other members, that he did not know of any other evidence that was to be taken, which was not disputed by any other member of the committee. That there, at that time, and immediately following the demand of said attorney as aforesaid, the city engineer of said city, who was present, was privately and secretly informed that the committee desired to have him present at a meeting to be held the following day to give an estimate of. the value of said plant. That on the following day said committee met secretly, and without notifying the water company or its said attorney, and took the testimony of said city engineer and one Schuyler, a member of the board of public works of said city, and took from them their estimates of the value and cost of every part of the distributing system, pumps, wells, and other property of the plaintiff, not including its water rights, rights of way or real estate. That said meeting was held secretly in a back room of the office of the city attorney, while all of the other meetings of the committee had been held publicly in the room of the board of aldermen, was held on a legal holiday when the offices of the city in the City Hall were closed, and said meeting was held with the doors closed and locked. That the plaintiff had no notice or knowledge of said meeting or the taking of said evidence, and was not present either by its officers or its attorney or otherwise, and was given no opportunity to be present or investigate or cross-examine with reference to the evidence given and estimates furnished. That said estimates so furnished were largely less than the cost as proved or estimated by the evidence of the officers

of the plaintiff taken by said committee, and sworn statements furnished by its officers, and the estimates so furnished in the absence of the plaintiff were taken with but few exceptions, and as to small amounts, as the value and cost of said plant by said committee, and made the basis of their report, and of the rates fixed by them and subsequently adopted by the ordinance of the common council. That the report of said committee was made up and concluded on the twenty-fourth day of February, 1890, was presented to both houses of said common council on the evening of that day, and was then adopted by each of said bodies without change. That the attorney of the plaintiff appeared before each of said bodies and demanded that the plaintiff be allowed to offer evidence to said common council, with reference to the fixing of said rates, but his right to offer said evidence was denied, and no evidence was received or heard. That the evidence taken by the committee was taken down by a stenographer and transcribed, but was never read to or submitted to either board of said common council, but that the members of said committee, or some of them, stated their recollection of the evidence upon which their said report was based. That the ordinance mentioned in the complaint, fixing said rates, was passed and adopted by both of the bodies of said common council on the evening of the twenty-fifth day of February, 1890, without any further hearing, or opportunity to be heard, on the part of plaintiff."

It is claimed that this finding is not altogether in accord with the evidence; but, though we find some verbal inaccuracies, we think that in all material particulars it is sufficiently supported.

It is plain that these facts show so much of unfairness in the investigation had by the common council as to overcome the presumption of the correctness of its decision. It was clearly the duty of the council to give to the water company, at least when requested to do so, a reasonable opportunity to be heard, not merely for the purpose of presenting its own evidence, but also of explaining or overcoming, if it could, evidence presented by others. The company, of course, could not claim as a right to be heard at any time it chose; but it certainly was entitled, upon reasonable request for that purpose, to be present when evidence was being produced before the council or its committee, or to be otherwise informed of that evidence and allowed to

overcome it if possible. The action of the committee, for which no sufficient excuse was given, appears to have been taken for the very purpose of excluding the plaintiff when that evidence was received, and it therefore seriously impugns the fairness of the investigation. Indeed, such an investigation ought to be held publicly, and upon such reasonable public notice of the times and places of the meetings as will enable those interested to be present; and a neglect of this precaution, when unexplained, must always give rise to injurious suspicions.

A number of other points have been discussed by counsel, but they are all either covered by what has been said, or have been thereby rendered unimportant.

For the reasons above set forth, the judgment and order appealed from are reversed, and the cause remanded for a new trial.

Henshaw, J., and McFarland, J., concurred.

GAROUTTE, J., concurring.—The findings of fact made by the trial court which are deemed necessary to a consideration of the questions presented before us are as follows: 1. On the twenty-fourth day of February, 1890, and at the time the ordinance mentioned in plaintiff's complaint was enacted by the common council of said city, the water plant and system of the plaintiff was of the value of $750,000; 2. The necessary operating expenses of plaintiff in conducting its property from July, 1890, to July, 1891, and the sum actually expended, was $40,-000; 3. Plaintiff was and is indebted upon its outstanding bonds regularly issued in the sum of $1,000,000, bearing interest at five per cent per annum, of which sum $750,000 was necessarily expended in the construction of the plant, and the interest upon which is $50,000 per annum; 4. The total receipts received under said ordinance from July 1, 1890, to July 1, 1891, amounted to $65,788,95, and no more; 5. The annual depreciation of plaintiff's plant is three and one-third per cent per annum; 6. The rates as fixed by the ordinance for the year commencing July 1, 1890, were not just or reasonable, and were grossly oppressive, unjust, and unreasonable.

Owing to the fact that the case was not brought to trial in the lower court until the year had expired covered by the ordinance,

it will be observed that the court was enabled to find the actual receipts to the plaintiff from rate payers during that period. In the discussion of the questions presented by this appeal, we shall assume that the findings of the court, to the effect that the water plant of the plaintiff corporation was of the value of $750,-000, and that its operating expenses for the year would be and were $40,000, have support in the evidence and stand as facts on the record.

In the fixing of water rates by a city, as contemplated by the constitution, it is evident that the valuation of the plant is the basic element upon which the whole investigation rests. The original cost of construction is simply an item to be considered in fixing the present valuation. It is a circumstance, strong or weak, entering into the final conclusion of the municipality upon the question. But as to the amount of the bonded indebtedness, or the amount of interest annually accruing thereon, we fail to see their materiality in determining the value of the plant, or the sum total of revenue to be raised from the sales of water. It is not a question in which rate payers are concerned, whether the water company has no outstanding indebtedness, or is floundering under a bonded debt which threatens to sink it at any moment. If the municipality is required to establish a scale of rates which will produce a revenue sufficient to pay interest upon outstanding bonds, this provision of the constitution would not only be a perpetual guaranty to the bondholders for the payment of their annual interest, but a constant incentive to additional issues of bonds. Such conditions were never contemplated by anybody. It is the duty of the municipality, when it has arrived at a determination as to the valuation of the plant, to determine the necessary outlay for the ensuing year; then to determine what would be a reasonable, just, and fair compensation to the company, based upon the valuation of the plant, and thereupon to fix a schedule of rates which will produce that sum of money. If there be outstanding bonds, the company may apply its income to the payment of interest thereon. If there be no outstanding bonds, this income may pass to the pockets of the stockholders in the shape of dividends declared. A municipality must fix a fair and just rate for the water, based upon the valuation of the plant, and when it has done this, its duty has been performed, and the revenue collected

under such rates is the property of the company, to do with as it seems best.

Under and pursuant to constitutional authority (Const., art. XIV, secs. 1, 2), the legislature (Stats. 1881, p. 54) passed an act, by the terms of which it was made the duty of the board of supervisors, town council, board of aldermen, or other legislative body, of any city and county, city, or town, in the month of February of each year, to fix the rates which shall be charged and collected by any person, association, company, or corporation for water furnished to any such city and county, or city or town, or the inhabitants thereof. It is now contended by appellant that the authority to fix water rates, coming directly from the constitution to the municipality, the rates fixed under such authority have the same binding force and effect, and occupy the. same position as to the law and the courts, and should receive the same consideration as though fixed directly by the legislature, in the absence of the aforesaid constitutional provisions. Let it be conceded, still the claim is unsound that this action of the municipality is conclusive; it is neither above nor beyond the law, and a court of equity will reach out and review it whenever the facts so demand. The legislature itself has no right or power to legislate a man's property away from him, and, beyond doubt, courts are vested with jurisdiction to declare all such attempts void, and will exercise that jurisdiction whenever the occasion presents itself.

The legislature of the state of Minnesota enacted that the rates for freights and fares fixed by the railroad commission of that state should be conclusively presumed to be reasonable. In *Chicago etc. Ry. Co. v. Minnesota,* 134 U. S. 418, this enactment was declared void, as depriving a person of his property without due process of law, the court saying: "If the company is deprived of the power of charging reasonable rates for the use of its property, and such deprivation takes place in the absence of an investigation by judicial machinery, it is deprived of the lawful use of its property, and thus in substance and effect of the property itself, without due process of law, and in violation of the constitution of the United States; and, in so far as it is thus deprived, while other persons are permitted to receive reasonable profits upon their invested capital, the company is deprived of the equal protection of the law." Again, it is

said in *Stone v. Farmers' Loan etc. Co.*, 116 U. S. 307: "From what has thus been said it is not to be inferred that this power or limitation or regulation is itself without limit. This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretense of regulating freights and fares, the state cannot require a railroad corporation to carry persons or property without reward; neither can it do that which in law amounts to a taking of private property for public use, without just compensation or without due process of law." The same doctrine is also declared in *Georgia etc. Banking Co. v. Smith*, 128 U. S. 174; *Budd v. New York*, 143 U. S. 517; *Reagan v. Farmers' Loan etc. Co.*, 154 U. S. 362; *St. Louis etc. Ry. Co. v. Gill*, 156 U. S. 649. As far as we are given light to see, from the consideration of the doctrine enunciated by the many cases coming from the highest court of the land, it would appear to be immaterial whether this power to fix a schedule of rates is vested in the legislature, or delegated by the legislature to some inferior board or tribunal, or given to such board or tribunal by direct grant from the constitution. Whether it be done by the express act of the legislature, or by council or commission, under authority from a higher power, or whether the act of such council or commission in fixing rates be judicial or legislative, are matters outside the question. If we understand the doctrine declared by the highest judicial tribunal, it is that the courts have no power to declare rates fixed by the body legally authorized so to do unreasonable, unless those rates are so unreasonable and oppressive as to deprive a party of the equal protection of the law, and result in a practical confiscation of his property. And when any attempt is made to despoil the owner of his property, it is the highest duty of a court of equity under the constitution to afford him shelter and protection.

In *Spring Valley Water Works v. San Francisco*, 82 Cal. 306, 16 Am. St. Rep. 116, an exact duplicate of the present question was before this court, and it is there said: "But the courts cannot, after the board has fully and fairly investigated and acted by fixing what it believes to be reasonable rates, step in and say its action shall be set aside and nullified because the courts, upon a similar investigation, have come to a different conclusion as to the reasonableness of the rates fixed. There must be ac-

tual fraud in fixing the rates, or they must be so palpably and grossly unreasonable and unjust as to amount to the same thing." Aside from any question of actual fraud, rates that are so unreasonable and unjust as to deprive the owner of any revenue whatever from his property would amount in law to fraud upon his rights under the constitution. In disposing of appellant's contention that the schedule of rates fixed by the city council is conclusive upon the court, we have also disposed of respondent's contention that the law giving to the city the right to fix water rates is violative of the constitution of the United States, as depriving a man of his property without a hearing before a judicial tribunal. Both positions are equally erroneous.

This court is not here to declare what are reasonable rates. The constitution has vested that power and duty in the council of the city of San Diego, and the exercise of that power by the council cannot be questioned by the courts unless constitutional rights are violated. The question is not, What rate would this court fix if the duty were cast upon it of fixing rates? but rather, Will the owners of the plant be deprived of constitutional rights by an enforcement of the order of the council fixing rates? If the rate fixed by a municipal council was twice too large, I know not what jurisdiction of this court could be invoked to right the wrong. Hence, it is apparent that it is only in exceptional cases that an order fixing rates may be set aside by judicial decree.

Taking the findings of fact as they stand, the schedule of rates fixed by the city should not be disturbed. The valuation of the plant is $750,000; the operating and current expenses are $40,-000. The revenue from the sale of water under the schedule of rates would be and actually was $65,000. This leaves a profit of $25,000 upon the investment. To be sure it is small, when we consider the amount of money invested. To be sure, it is not enough, and possibly not one-half the sum that could be earned if that amount of money was invested in other business undertakings, but with these things we have nothing to do. Those are matters passed upon by the city in the exercise of a discretion granted by the constitution, and its decision as to the reasonableness of the amount of revenue to be derived by the company from the rates is conclusive upon the courts. While this sum is not enough upon this character of investment, still it is three and one-half per cent, and such return is a substantial

profit.  We mean it is so substantial that a court of equity, in view of the law of the land, cannot say that the rates are so unreasonable as to be confiscatory in character, and thus violative of any principle of constitutional law.

Mr. Justice Brewer of the supreme court of the United States has probably given this question more thought and investigation than any other jurist in this country, and he says in *Chicago etc. Ry. Co. v. Dey*, 35 Fed. Rep. 866: "Counsel for complainant urge that the lowest rates the legislature may establish must be such as will secure to the owners of the railroad property a profit on their investment at least equal to the lowest current rate of interest, say three per cent.  Decisions of the supreme court seem to forbid such a limit to the power of the legislature in respect to that which they apparently recognize as a right of the owners of the railroad property to some reward; and the right of judicial interference exists only when the schedule of rates established will fail to secure to the owners of the property some compensation or income from their investment.  As to the amount of such compensation, if some compensation or reward is in fact secured, the legislature is the sole judge."  Subsequently, the same question was again presented to him in *Reagan v. Farmers' Loan etc. Co., supra,* and also in *Ames v. Union Pac. Ry. Co.,* 64 Fed. Rep. 165, and in those cases neither he nor any other of the justices of the supreme court retreated or advanced from that position.

This balance of $25,000 is profit, unless it is swallowed up by the finding of the court that plaintiff's plant suffered an annual depreciation of three and one-half per cent, and the conclusion of law therefrom that a percentage upon the investment to that amount should be added to the operating expenses before the point is reached where profit begins.  We are satisfied that this finding has no support in the evidence, even conceding the conclusion of law drawn therefrom sound.  In the first place, the evidence develops that there can be no general depreciation of this plant as a whole.  There are tunnels, wells, reservoirs, water rights and real estate, amounting to more than one-half of the valuation of the plant.  There is no depreciation of these things; there is no wear and tear, no permanent and gradual destruction by use and age.  Most of them stand as everlasting as the hills.

The theory of plaintiff in this regard seems to be that the life of a plant of this character may be approximated at thirty years, and that a sinking fund of one-thirtieth of its value should be collected from the rate payers annually and laid aside to be handed to the stockholders upon the sad occasion of its demise, as an alleviating salve to their sorrow. But such a thing is all wrong, for it results in the consumers of water buying the plant and paying for it in annual installments. Consumers of water cannot be charged with cost of construction. They are only to pay a fair interest upon such cost; and as we look at this matter, if this three and one-half per cent is not stowed away in the vaults as a sinking fund to make glad the hearts of the stockholders upon the expiration of the thirty years, which theory cannot be tolerated for a moment, then it must go into the plant as cost of construction, and, therefore, not chargeable against the consumers. The result of such expenditure is only to increase the valuation of the plant, and to thereby draw from the consumers an income upon the amount of the investment. If improvements are made in the plant, the cost of these improvements should be charged against the construction account. If repairs are made upon the plant as it stands, as, for example, a new pipe substituted for an old piece of the same size and quality, such charge should be considered operating expenses.

Upon an examination of the record we find these views fully corroborated in the evidence of the water company, given by one of its most important witnesses. He testified: "Where we took up one pipe line or a portion of it on the street, and put down another, if it was the same size pipe, to renew it we would charge it to expenses. If it was a different size we would charge the difference between them, the increased size, to construction. Where we sell pipe that we take up, we credit that to construction. If we have to renew any portion of the same size pipe, we charge it to expenses."

This question has arisen incidentally in *Union Pac. R. R. Co. v. United States*, 99 U. S. 402, and also in *Reagan v. Farmers' Loan etc. Co.*, supra, but neither case looks the other way from the views we have expressed. When the question arises between the corporation upon the one side and its bondholders or stockholders upon the other, or when it arises upon a construction of a contract with the government, as in one of the cases just cited,

operating expenses, cost of construction, and net earnings may stand upon a different footing. Those cases are not this case. This is neither a question of bookkeeping nor net earnings. The particular system pursued by corporations in segregating and applying their gross receipts is likewise immaterial. The whole matter is a pure question of what is just and right between all parties interested. The consumers of water have rights, and possess equities which must be considered equally with those of the company. They are to be taxed to pay the amount called for by the schedule of rates, and these rates, in justice to them, should be fixed at the smallest possible amount, taking into consideration what is just and equitable to the owners of the property. In cases of the present character under the head of operating expenses the company is entitled to charge for keeping the plant in its normal condition; and the sinking of new wells, the building of new reservoirs, the erection of additional buildings, and the substitution of larger and better pipe (to the extent of the difference), do not come under the head of operating expenses, but should be charged to construction account. If this were not so, a water plant inferior in all things in a few years could be transformed into a water plant superior in everything, at the expense of the consumer. This would be an advantage to the owner and a burden to the rate payer neither contemplated nor justified by the law.

For the foregoing reasons I think the judgment and order should be reversed and the cause remanded.

TEMPLE, J., concurring.—I agree generally in the views expressed by Mr. Justice Garoutte. I do not comprehend how in this case the exercise of the power to regulate charges or to fix compensation for furnishing water is a taking within the meaning of section 14, article I, of the constitution. The waterworks were all constructed subsequent to the adoption of the constitution of 1879. The city owns no waterworks. It is provided in section 19, article XI, of the constitution that any individual or company shall have the use of the streets, for laying down pipes and conduits and making connections therewith, so far as necessary for introducing into and supplying the city and the inhabitants with fresh water, "upon the condition that the municipal government shall have the right to regulate the charges

thereof." The corporation, therefore, constructed its works and invested every dollar of its capital upon this express condition. The privilege of distributing water for pay is a franchise which might have been withheld altogether. It is really a privilege granted to a private individual to perform a public service for pay. It is granted to all upon this express reservation of the right to regulate charges.

Article XIV is the complement to the section before quoted. It declares that the use of all water appropriated for sale or distribution is a public use, subject to the control of the state, and that in cities the "rates or compensation" shall be fixed annually by the governing body of such city, which rates shall continue in force for one year only, and, further, that any individual or company collecting water rates otherwise than as so established shall forfeit his or its franchise and works to the city.

There is here no taking under the power of eminent domain, nor in any other sense than is implied in every service rendered for hire.

There is, then, no obligation to remunerate water companies for investments made or to allow interest thereon, either upon first cost or present value. The obligation is to compensate for service rendered. What will constitute just compensation involves many considerations. Certainly, no allowance need be made for unnecessary expenditures, either in construction or management. Nor is the test always the cost to the companies. There is no limit to the number of companies which may bring water into a city. The franchise is freely offered to all in the constitution. If there are many companies, and thereby the cost of management is increased, this fact would not call for increased rates. The service is worth no more when rendered by ten companies than when one company furnishes all the water. Incidentally to the inquiry as to what is a fair compensation for the service, the governing board may well inquire into the cost which the company whose rates are to be regulated have incurred in bringing water to the city and in distributing it. But these matters are merely incidental and never determinative of the question.

All the elements entering into the question having been determined, opinions would still vary as to what would be fair compensation. The constitution has imposed upon the govern-

ing body of the city the duty of determining that question, and granted the privilege of the streets and the franchise to distribute water upon the express condition that such boards may determine the question. As already shown, the works have been constructed under this express agreement. The court cannot fix the rates—is, in fact, expressly prohibited by the letter of the constitution from so doing. The company will forfeit its franchise and property if it collects rates "otherwise than as so established." This prohibits them from collecting charges as fixed by the courts. The only proper judicial question is, whether compensating rates have been fixed. Whether they are too high or too low is not a judicial question. The judge cannot substitute his judgment for that of the body to whom the discretion is given by the constitution.

There is much learning upon this subject in the law books, and a great variety of opinions, not to say contrariety, can be found. I know of none which—the facts considered—need be deemed adverse to these views. If there were no such constitutional provisions, the case might be different.

I notice that section 19, article XI, applies only to cities which own no public works. Whether the privilege of using the streets or the right to distribute and sell water exists or can exist in cities which do own such works may be a question. If they do exist, there can be no doubt of the application of article XIV to persons or corporations selling water in such cities. In such cases could the city be compelled to take and pay for other works which only diminish the value of its own property?

HARRISON, J., concurring. I concur in the reversal of the judgment and order of the superior court. In finding the value as well as the cost of the plant the court included many items which were not proper to be considered for that purpose, and which are mentioned in the opinion of Mr. Justice Van Fleet as improperly constituting a part of the cost of the plant. While the cost of the plant may be properly considered as an element of evidence in ascertaining its value, I am clearly of opinion that it should not form the basis of estimating the revenue which the water company is entitled to receive. The value of the plant may change from year to year as materially as may the cost of operating the works, and there is good reason for holding that

the constitution requires the rates to be fixed each year, in order that they may be adjusted to this changing of value. It is not necessary here to lay down a rule which shall be applicable to all conceivable conditions, since the conditions governing in one municipality, or attending the supply of water to its inhabitants, will hardly ever be the same elsewhere, and it is only proper in the present case to consider the circumstances attending the water company and the municipality now before the court.

In designating the city council as the body to fix these rates the constitution has clearly indicated that they are not to be fixed by the courts. The water company has the right to protection by the judiciary from the enforcement of such rates as will deprive it of compensation for furnishing the water; but if the rates fixed by the council afford compensation to the water company, the question of the reasonableness of this compensation is a question of fact which is not open to review by the courts. If the courts are authorized to determine the amount of compensation which will be reasonable, the rates will be fixed by them, rather than by the city council; and, for the same reason, the city council, and not the courts, are authorized to determine whether the rates, to be reasonable, shall be fixed at such amount as will yield to the water company any definite rate of interest.

Even if it should be conceded that reasonable rates would be such as will yield to the water company a return equal to the lowest current rate of interest on the value of its property, it appears from the findings of the court that the rates fixed herein yielded a return of more than three per cent upon the value of the plant, and it is a matter of general notoriety that this is more than is on an average received by capitalists from permanent or fixed investments with the guaranty of the government as their security. What may be the lowest current rate of interest upon an investment depends upon so many circumstances that no particular rate can be predicated in advance of any particular investment, but it is in all instances a question of fact and not of law, and is not to be determined by the judiciary. After it has been determined by the city council, the judiciary are not authorized to set aside its determination on the ground that in its judgment it is too small, any more than it could set aside

the rates on the ground that the income yielded thereby would be too great.

BEATTY, C. J., dissenting.—I think the judgment and order appealed from should be affirmed. In fixing water rates, it is the duty of the city council to provide for a just and reasonable compensation to the water company. Anything short of that is simple confiscation, and is not only a violation of constitutional rights but is an extremely short-sighted policy. Rates ought to be adjusted to the value of the service rendered, and this means that the water companies should be allowed to collect annually a gross income sufficient to pay current expenses, maintain the necessary plant in a state of efficiency, and declare a dividend to stockholders equal to at least the lowest current rates of interest, not on the par or market value of the stock, but on the actual value of the property necessarily used in providing and distributing the water to consumers.

To arrive at the actual value of the plant, water rights, real estate, etc., cost is an element to be considered, but is not conclusive. The plant may have cost too much, it may have been planned upon too liberal a scale, its construction may have been extravagantly managed, the real estate and water rights may have cost less or more than their present value, and, therefore, cost will seldom represent the actual capital at present invested in the works, but such present value is the true basis upon which compensation, in the shape of dividends, is to be allowed.

As to current expenses, all operating expenses reasonably and properly incurred should be allowed, taxes should be allowed, and the cost of current repairs.

In addition to this, if there is any part of the plant, such as main pipes, etc., which at the end of a term of years—twenty years, for instance—will be so decayed and worn out as to require restoration, an annual allowance should be made for a sinking fund sufficient to replace such part of the plant when it is worn out.

In its findings and conclusions the superior court seems to have conformed to these views, and, making every allowance for any minor errors that may appear in the record, the evidence is amply sufficient to sustain every material finding, and the find-

ings clearly sustain the conclusion that in this case the rates fixed were grossly and palpably unjust to the water company. The judgment and order should be affirmed.